UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
vs. )
) No. 1:16-cr-10225-DPW
EDWARD J. TUTUNJIAN AND )
EJT MANAGEMENT, INC., )
Defendants. )

BEFORE: THE HONORABLE DOUGLAS P. WOODLOCK

EXCERPT FROM SENTENCING HEARING
REMARKS AND PRONOUNCEMENT OF SENTENCE BY THE COURT

John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
December 13, 2016

Brenda K. Hancock, RMR, CRR
Official Court Reporter
brhancock@msn.com

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE MA
By: AUSA Sandra S. Bower
AUSA Michael L. Tabak
1 Courthouse Way
Suite 9200
Boston, MA 02210
On behalf of the United States of America.

GOOD SCHNEIDER CORMIER
By: Andrew Good, Esq.
Philip G. Cormier, Esq.
83 Atlantic Ave.
Boston, MA 02110
On behalf of the Defendants.

EXCERPT

THE COURT: Thank you, Mr. Tutunjian.

Well, let me just ask one question, perhaps for Probation. With respect to community confinement, assuming that that is a viable alternative here, number one, can the costs be imposed entirely on the defendant for, say, Coolidge House?

THE PROBATION OFFICER: I'm not certain, your Honor. I haven't seen that come up yet, but you mean the cost of having him be held there?

THE COURT: Right. No cost to the government, take away the liberty that is provided by community confinement in Coolidge House. That's the question.

THE PROBATION OFFICER: I'm not sure it's authorized, but your Honor could make a judicial recommendation, and that way it would be something that would be considered if it is authorized.

THE COURT: And the respective costs, as I understand them, annually for forms of incarceration or forms of depravation of liberty set forth in Paragraph 127, they are $30,621 a year for incarceration in the Bureau of Prisons, $28,999 for community confinement, and for pure supervision it's $3,909.

THE PROBATION OFFICER: Yes, your Honor.

THE COURT: Those are the respective costs.

THE PROBATION OFFICER: Mm-hmm.

THE COURT: Well, this presents great difficulties. That does not entirely distinguish it from every sentencing that I have ever participated in, and that Ms. Bower has accurately described what I think is involved in sentencing, which is the accommodation of incommensurables, a variety of different goals, and some goals that frequently are at odds with each other. The process of working that through comes to a result which is meant to be that accommodation, but it is done in an overarching way. Number one, the sentence should be sufficient but no more than necessary to serve the purposes of Section 3553. I start with the guidelines themselves, not because they are inherently reasonable, frequently I feel just to the contrary, but in the case of the tax guidelines they seem to me to be realistic. Many of the guidelines do not involve the kind of actual feedback that is supposed to inform the Sentencing Commission. The income tax guidelines do.

And so, those are a kind of touchstone and a touchstone that suggests that in the heartland of cases -- and I recognize that Mr. Good has argued that this is not in the heartland of cases -- but in the heartland of cases the idea of prison time somewhere above 24 months or more is reasonable. But starting with the guidelines doesn't end it. Section 3553 requires me to consider a variety of factors. We have touched on them in various ways here.

I want to start with the nature and characteristics of the defendant. I credit Mr. Tutunjian's statement here about deep regret and unhappiness with his own inability to meet the high expectations that he had, and I must say that reading the letters that I've received here, and I have been at this quite some time, like Mr. Good, but this is the most impressive collection of letters I have ever received. They touch on a variety of aspects of Mr. Tutunjian's life that are laudable. That is not a clearing of the throat on my part. I think they accurately capture Mr. Tutunjian as a human being. One can go through these and find all sorts of individual stories that are personally affecting.

I do not mean to pick out vignettes, but rereading the letters again over the weekend I just picked out shorthand characterizations of him.

One is from Mr. Kaprielian, who writes that Mr. Tutunjian is a "hard-working man who has shown many, many, many kindnesses to others throughout his life."

There's another one from Elizabeth Sharawara, if I pronounce it correctly. I apologize if I have not. But what she said is that she's always seen the same values of family, hard work, down-to-earth lifestyle displayed in the Tutunjian home and in the community and through Mr. Tutunjian, and I credit that. These letters support that.

This is not lèse-majesté by some plutocrat. This is I

think reflective of an unassuming man, a man who lacks arrogance, who has been essentially humble, who does have a concern about the general human condition. Judges are adjured not to impose their judgment with fear or favor or tipping the scales toward the rich or the poor. It is clear to me that Mr. Tutunjian takes each human being that he deals with on their own terms and is not hierarchically driven. All of that is true, but that is not why we are here.

We are here because of a business decision, a business model that Mr. Tutunjian undertook, and that business model in some ways -- and it is unfair to use shorthand descriptions or at least not complete to use shorthand descriptions -- but this was a business model of doing good enabled by doing wrong. Doing good? Yes. Providing jobs for people who might not otherwise have jobs? Yes, being at least as disclosed in what has been provided to me in a contested proceeding, not in a one-sided story, but a contested proceeding in which parties have had an opportunity to submit and contest the particulars, an individual who treated his employees well on a variety of different levels.

But the business plan was to do it by not doing what every other business is required to do, and to be able to obtain money by not paying the taxes that every businessman should pay, by facilitating forms of government payment, like Section 8 payments, in a way that manages to skim for his own

employees something that should be generally available on fair terms to everyone, and depriving his employees perhaps of some benefits that they do not fully understand. He was dealing with a group of employees who have perhaps different views about paying taxes and the value of cash, perhaps value in cash up front as opposed to Social Security payments down the line. But the short of it is it was a business plan, a business plan that other businesses don't engage in and, consequently, can't benefit from, but he did, and benefit he did, very substantially.

Now, I do not mean to in any way depreciate where I started. This is a hardworking individual; this is not someone born with a silver spoon in his mouth. He built the business from the ground up, and he did it in a fashion that did not, at least it appears to me, involve looking down on his employees. He looked at them as a community, but it was a community that benefited him substantially, and one can say that it is easier to be generous when you have more money than other people, and one of Mr. Tutunjian's ways of getting more money than other people is to avoid the law.

Now, that treats it as a purely economic matter, and I don't mean my characterization of the defendant to be put in that sort of fashion. Ms. Bower said that he was a complex individual. I think that that is correct. It is a complex set of circumstances. Mr. Good talks in terms of multiple grounds

or multiple motivations, perhaps, here. I think that is true. But I start with the nature and characteristics of the defendant, because perhaps more than anything else it focuses on the challenges of this case.

But now I have to focus on the seriousness of the offense. It is a lot of money carefully calculated by the parties to figure out what is involved, money that competitors probably would have enjoyed having access to.

One of the reasons that the penalties in the tax setting are ferocious is that they are a cost of doing business, and so, to the degree that the penalties can be imposed in a way to make it less attractive to incur those costs, the government has had fairly substantial penalties built into payroll tax violations, for example. But it is too much to say that it is just taxes. On the other hand, it is perhaps overwrought to say, as Learned Hand once said, taxes are the price we pay for civilization, but it is, and so each dollar that Mr. Tutunjian takes to distribute in the way that he would like to distribute is taken from all of us, and that is the seriousness of the offense. Not nickel-and-diming, this is big-time money, and it is in the context of people who are not unhappy with the opportunity to receive cash, the opportunity even to receive jobs, people who are new to this country and perhaps don't embrace the idea that you pay taxes as a price of civilization. The short of it is, I view it as a

very serious crime. The way in which you sanction it cannot just be money, it has to be something more. It has to be the loss of liberty.

Now, I turn to the questions that are raised by deterrence. We talk sometimes in terms of specific deterrence and general deterrence. Specific deterrence is what do we need to do to keep Mr. Tutunjian from doing this again? Well, in some ways the unfolding of all of this has made it unlikely that Mr. Tutunjian will be engaged in this sort of thing again. I have said that I am of the view that I should credit the statement that he made here today. It seems consistent with slowly coming to grips with his responsibility. I am not sure putting him in jail is going to serve that purpose, and we have to keep in mind that the standard that I employ is sufficient but not more than necessary to serve the purpose of Section 3553.

But then we come to general deterrence, and that is in some ways the fishbone in my throat. There are other people out there less empathetic than Mr. Tutunjian, less likely to give the shirt off their back than Mr. Tutunjian is. Mr. Good has referred to various of his previous clients, unnamed, might fall in that category. There are people who are just genuinely greedy. Let's use them. So, they look at this and they say, well, if you can pay a lot of money and not go to jail and not have your liberty restricted, then it's worth it, because

general deterrence is I think served least by numbers of months in jail. It becomes a metric. It is much better served, I would think, or would be much better served by quick and certain punishment.

But that is not the lot of our life in the criminal justice system in the United States. Due process and a variety of other reasons, limited resources by prosecutors, all sorts of things, mean that it sometimes takes a long time to get to it. And so, what do we have? We have time in jail as a way of saying to those other people who might be considering what Mr. Tutunjian did, "Don't do it, because you're going to pay for it." That's what general deterrence is about, and that weighs in favor, as I made clear, of restrictions on liberty, generally incarceration.

I am concerned about disparity. That's what the Sentencing Guidelines were all about when they were created just about the time I came on the Bench. They really were meant to address this; that Senator Thurmond felt very strongly that white-collar defendants in the Northeast weren't getting much in the way of sentences, that white-collar sentences or sentences of economic crime were not being particularly forcefully sentenced. But that was not his major concern. He was really concerned with non-white-collar in the Northeast, that judges were just too soft.

At the same time Senator Kennedy was concerned about

sentencing generally and the arbitrariness of it, perhaps less so for non-white-collar crime than for other kinds of crime having to do with their respective views about the social contract, but certainly Senator Kennedy was concerned about white-collar crime.

And so, they imposed a structure, and the structure was meant to say, give voice to a view that Judge Friendly expressed: that you can commit a crime with as much damage involving a crowbar as a fountain pen.

Now, calling this a white-collar offense does not quite provide the nuance of where this took place and what kind of business it was, but it is a crime of a fountain pen with invisible ink that didn't show what was being paid out to people. And so, looking at this from the perspective of disparity is very important to me. If he came from an underprivileged background, incurred as much loss to the United States as Mr. Tutunjian did, there would be almost no talk about not going to jail. That may bespeak who judges are, what class they come from, what the general attitude of the public is, but it imposes a form of disparity.

And so, you look to the guidelines, and the guidelines here, as I have said, provide a kind of reasonable range. The short of it is, departing from the guidelines or departing from incarceration strikes me here as incurring the dangers of unwarranted disparity that the guidelines system or the

Sentencing Reform Act of 1984 was supposed to deal with.

So, then I come to the other major issue for me in formulating a sentence, and that is the impact of correctional treatment, generally thought of as incarceration. I have read carefully the submissions, tried to familiarize myself a bit more about the impact of health conditions, looked at the question of the Bureau of Prisons' ability to deliver healthcare and particularly with reference to diabetes.

I do credit the submission by Dr. Serdy concerning the kinds of treatment that Mr. Tutunjian has had as his regimen for some time now that manages his diabetes, and I do recognize that interrupting that will to some degree interfere with his medical circumstance. And, just as general deterrence, what would a non-jail sentence mean to others considering the kind of activity that Mr. Tutunjian engaged in mean for evaluation of whether it is worth it to do it? I also have in mind that imposing a collateral harm on someone else by sending him into a medical environment that cannot provide the care that he has been accustomed to and has apparently managed him is a form of additional punishment, a kind of corporal punishment.

I am concerned, of course, by the idea that rich men are able to go to the Joslin Diabetes Center; poor people aren't always. And so, does this lead to a disparity? Perhaps. But, ultimately, I am dealing with the sentencing of an individual, and my sentencing of the individual has to take

into consideration all of these factors. I believe that he has to be deprived of his liberty, but it doesn't have to be in the Bureau of Prisons; it can be in the community confinement. I believe, but I will structure this, and Ms. Broquist will help me do that, that I can impose the costs on Mr. Tutunjian for the depravation of his liberty.

Should the taxpayers pay some $30,000 a year to keep him in a medical facility of uncertain quality? In this context I think not. Should Mr. Tutunjian pay for his depravation of liberty? Yes, he should, at the Coolidge House or some similar facility, and I am going to make it a period of -- I believe I can do this, and Ms. Broquist will tell me -- 18 months in the Coolidge House, all the costs to be paid for by Mr. Tutunjian, and the way in which I think I would like to do that is to say that he will pay the cost directly, and if he doesn't, then he will pay as a cost of fine that amount. We may have to work out what that means under these circumstances.

Ms. Broquist.

THE PROBATION OFFICER: Your Honor, I've been able to clarify a little bit with our office while you have been speaking, and, as it turns out, they have not seen it before that it's been authorized, but the defendant would be required to pay 25 percent of his income towards the subsidy of the housing. So, your Honor would want to impose that as a fine as opposed to payment of the cost of the Coolidge House stay.

THE COURT: Well, I think I would say not less than the cost of Coolidge House, the actual cost of Coolidge House, which I understand from the reports to be roughly $29,999 or 25 percent of his income. That is a fairly severe penalty, it seems to me, but it does two things. Number one, it deprives him of liberty without imposing corporal punishment needlessly; and, second, it imposes an increased cost associated with this that he, himself, bears for being the author of his own misfortune and that of the public generally. It may be that we will have to work on the judgment in this case a little bit to be sure that we have got this --

THE PROBATION OFFICER: Yes, your Honor. I'll get some guidance from our office, and we will contact your clerk.

THE COURT: But that is the direction in which I want to go on this, considering all of these factors.

Now, let me go back to the particulars of the recommendations and the sentence itself.

I am imposing a period of probation of 18 months, all 18 months of which to be served in the community confinement. The community confinement shall provide for the defendant to make his own arrangements for medical treatment.

There is a fine to be imposed, and the fine is that the defendant pay not less than $28,999 on a per annum basis for his cost of confinement in the community confinement facility to which he is designated and not more than 25 percent

of his income. I understand that that income can be manipulated to some degree, but it is also going to be supervised by his obligations with respect to the Internal Revenue Service.

There is restitution in the amount of $1,391,012 to the IRS and $699,718 to the Wage and Hour Division of the Department of Labor. I understand that to have been paid, but it will be embodied in the Judgment itself. In addition, the defendant is obligated to pay a Special Assessment of $515 here for these several counts.

So long as the defendant has not paid all of his financial obligations, which are due and owing immediately, the defendant is going to be required to provide access to the Probation Office of any requested financial information. That may be shared with the United States Attorney's Office. The defendant shall file within 60 days of being placed on probation -- and he has now been placed on probation, which I believe is available because he was not taken into custody. Am I correct?

THE PROBATION OFFICER: Yes, your Honor, it is available, given the classes of conviction. Yes.

THE COURT: Given?

THE PROBATION OFFICER: Given the type of the convictions.

THE COURT: Right. The defendant is required to

provide the Examination Division of the IRS with all financial information necessary to determine his prior tax liabilities and to provide the Collection Division all financial information necessary to determine his ability to pay. And I will say that the fine, which can be as high as 25 percent of his income, is to take priority under these circumstances. He is to pay the fine before he pays the IRS for the ongoing financial obligations, except for the restitution up to date.

He is obligated to file accurate and complete tax returns for those years in which the returns were not filed or in which inaccurate returns were filed. He must make a good-faith effort to pay all delinquent and additional taxes.

He is subject to the mandatory conditions, that he not commit another federal, state or local crime, that under these circumstances he must provide a DNA sample as directed by the Probation Office. I will not impose a drug-testing condition, because it seems to me to be inappropriate here. And he must comply with the special conditions, including those that I have dealt with financially. But he is prohibited from possessing a firearm or other dangerous weapon, and, as I have indicated, he is going to be required to pay the balance of his fine and restitution according to any payment schedule that I might authorize if he does not pay it promptly. So, that provides a degree of supervision by the Probation Office over his financial circumstances.

I will add that, if there is any manipulation of income here, I will view it as a violation of his conditions of probation. This is not meant to provide a distortion of the way in which he takes income here. I also recognize that this is an uncertain time for him and for his family in terms of income, but, given that uncertainty, it is still necessary to provide a realistic form of supervision, and that is what I intend to do during the 18 months.

I assume that there will be a request for self-surrender here.

(Mr. Good nodded)

THE COURT: He is simply to permit that to take place in a reasonably orderly fashion. But what ordinarily --

THE PROBATION OFFICER: Your Honor, what we would do is, once the judgment is issued, we would do a referral to the Coolidge House, and because it's a condition of probation it wouldn't really be a self-surrender per se; it would just be as soon as a bed is made available.

THE COURT: All right. So, we will deal with it in that fashion. I do not mean it to be disorderly; I mean it to be as seamless as possible to serve Mr. Tutunjian's medical needs, in particular.

But let there be no mistake. Coolidge House is not Belmont, and it is a depravation of one's liberties, but it is also an opportunity for you, Mr. Tutunjian. There are people

there who are probably not unlike some of the people that you were helpful to in getting jobs and so on, people who are down on their luck who are trying to get started. You have been supportive to people like that in the past. My expectation is you will be supportive to people in that location in the future. That, at least, is part of why I have made that choice for that kind of sentence for you.

You should understand as well you have a right of appeal in this session, anyway, and you will discuss with your lawyers whether that makes any sense under these circumstances.

MS. BOWER: Your Honor, can I ask a clarifying question?

THE COURT: Sure.

MS. BOWER: So, if I understand it, the fine being imposed is at least $28,999 per year.

THE COURT: Right.

MS. BOWER: But up to a quarter of his income --

THE COURT: Yes.

MS. BOWER: -- whichever is greater.

THE COURT: It will be the higher, the higher of the two.

MS. BOWER: Okay. Thank you, your Honor.

MR. GOOD: I just want to consult.

THE COURT: Yes. Sure.

(Counsel conferred off the record)

THE PROBATION OFFICER: And, your Honor, just as part of the condition that he reside at Coolidge House, if you could also just add that he be required to comply with the rules of the facility.

THE COURT: Yes.

THE PROBATION OFFICER: Thank you.

MR. GOOD: I just have one point of clarification, your Honor. Mr. Tutunjian has income from the business, and we understand the direction not to manipulate that, and I understand that he is to pay 25 percent of that income as the fine, because it will exceed, I think, the annual cost.

THE COURT: Right.

MR. GOOD: The only other issue is that, as the agreement reflects, he has been selling real estate in order to pay the bank and pay his taxes. So, I'm hoping that the Court will treat the 25 percent as his earned salary, not the sale of the proceeds, because that he needs for these other obligations, the tax and --

THE COURT: It does, but I treat it as his adjusted gross income.

MR. GOOD: Okay.

THE COURT: It is not take-home salary from the company. It is his adjusted gross income.

MR. GOOD: Thank you, your Honor.

THE PROBATION OFFICER: And, your Honor, just for

clarification, it may take some time to get a bed for the defendant. So, when you say the 18 months, all of which to be served in the community confinement --

THE COURT: It starts to run --

THE PROBATION OFFICER: -- can we say less --

THE COURT: It starts to run when he enters Coolidge House.

THE PROBATION OFFICER: But he would also have to, then, technically be on probation a little bit longer than that for us to have authority, because if he's -- so perhaps we could say --

THE COURT: Okay. That's fair enough.

THE PROBATION OFFICER: -- the 18 months minus the time it takes to place him in Coolidge House, which I imagine can be done relatively quickly, or to add another month to give us the time. Because, otherwise, I don't think we would have authority over him until the sentence started.

THE COURT: All right. So, I think the way to accommodate that practical issue is simply say 20 months of probation, 18 months of which to be served in community confinement.

THE PROBATION OFFICER: Thank you, your Honor.

MS. BOWER: I'm sorry.

THE COURT: No, no. It is fashioning a sentence that is somewhat unusual, so it is important to talk through some of

these issues.

MS. BOWER: So, back to the 25 percent of his adjusted gross income.

THE COURT: Right.

MS. BOWER: For one year or for one year and 25 percent of the six months for the second year?

THE COURT: It is for 18 months' worth of --

MS. BOWER: 18 months' worth of income?

THE COURT: Right, adjusted gross income over the 21 months.

MS. BOWER: The 21 months.

THE COURT: I should say the 18 months that he is in custody in the Coolidge House, subject to Coolidge House.

Now, I have a feeling that this judgment, more than other judgments, is going to be an iterative document, because there are some corners that have to be squared properly, and we will do that, but I think we all understand the purpose of this sentence and the way in which it has been fashioned.

Mr. Good, did you have something else you wanted to add?

MR. GOOD: Yes. As your Honor has observed at the guilty plea hearing --

THE COURT: I'm sorry?

MR. GOOD: As your Honor observed at the Rule 11 hearing, Mr. Tutunjian no longer owns the taxi business, and we

have advised him not to participate in that business at all for City of Boston relationship reasons. Now, he can continue to draw a salary without working there, but I am not sure that it's in anyone's interest for him to actually work in the taxi business.

THE COURT: He will not be doing that for 18 months.

MR. GOOD: So, if he's at Coolidge House, at least in my experience, people work at some part of the day, so he'll get some sort of employment other than taxi business.

THE COURT: I will leave it to the Coolidge House to develop it, develop a program, which could include community service as well, as far as I'm concerned.

MR. GOOD: Okay. I just want to make clear about that.

THE COURT: But that is going to be dealt with at least at the initial stages by Coolidge House. To the degree, however, that forbearing a salary is reducing his adjusted gross income for this period in which he is obligated to pay a portion of it as a fine, that it seems to me may be a departure from my intent and something that I would look at as a violation of the terms of probation.

MR. GOOD: Understood.

THE COURT: But this is going to be policed by a variety of different entities, the IRS, Probation, and the U.S. Attorney's Office here, and if there is something going on

I will learn about it pretty quickly --

MR. GOOD: Very well, your Honor. Thank you.

THE COURT: -- I anticipate. Any other questions at this point, recognizing this is going to have to be developed a bit more?

So, then we turn to the question of EJT. There is a suggestion in some of the submittals that more of a fine or a fine could be imposed, that sort of thing. I think that the focus, particularly in the uncertainty here, ought to be and is on Mr. Tutunjian and his responsibility. I am going to adopt in toto the recommendation that is jointly provided by the parties under these circumstances, that is, probation for one year, restitution in the amount of $219,307 to HUD, which I understand has been made as of today, or has been made, I should say. I will not impose a fine under these circumstances. There is mandatory Special Assessment of $400.

Now, what that means in practice is that the corporate defendant remains under the supervision of the Probation Office, and it has to comply with the mandatory conditions that it not commit another federal, state or local crime; that it within 30 days designate an individual, official of the organization to act as the organization's representative and it be the primary contact; that it provide and answer truthfully all inquiries by the Probation Office and follow the instructions of the Probation Office; that it must notify the

Probation Office at least ten days prior to any change of principal business or mailing address; and it shall permit the Probation Office to visit the organization at any of its operating locales; that it notify the Probation Office within 72 hours of any criminal prosecution, major civil litigation or administrative proceeding; that it may not dissolve, change its name or change the name under which it does business unless all of the judgment involved here has been satisfied, and that, frankly, includes the obligation to assure compliance by Mr. Tutunjian with his financial obligations here. And the organization may not waste or without the permission of the Probation Office sell or assign or transfer its assets.

Now, the Probation Office is not going to be acting as a receiver or a supervisor of the business, but they are going to be involved to make sure that there are payments here that are properly made involving Mr. Tutunjian and that there is not waste from the business.

I must add, I guess, that, given the way in which I have formulated Mr. Tutunjian's sentence, I should have a parallel sentence for EJT for purposes of the time period of probation, making it 20 months to run concurrently with Mr. Tutunjian's probation, because they are mutually reinforcing under these circumstances, and both Mr. Tutunjian personally and the corporate entity have reinforcing responsibilities. I won't call it "personal guaranties,"

because that has a particular resonance in this setting, but that's what it amounts to.

MR. CORMIER: Just so we are clear, your Honor, for instance, if EJT were to have a buyer to buy the medallions, does that require --

THE COURT: Yes.

MR. CORMIER: -- preapproval of Probation?

THE COURT: It does.

MR. CORMIER: That's fine.

THE COURT: It does. Is that going to be withheld unreasonably? Of course not. But any movement of assets here are something that I want to know about --

MR. CORMIER: Understood.

THE COURT: -- or, more accurately, Probation should know about, and if they are concerned about it, then we'll take it up.

MR. CORMIER: Got it. Thank you.

THE COURT: Anybody else that we need to take up at this point? So, Ms. Beatty, I think, together with Ms. Broquist will get to work on a first draft, and I will approve it, and it will be provided to the parties before we enter this, just so that we are all on the same page for it, but I think you understand the plot of this.

Anything further?

MS. BOWER: No, sir.

THE COURT: All right. We'll be in recess. Thank you.

THE CLERK: All rise.

(WHEREUPON, the proceedings adjourned at 12:16 p.m.)

C E R T I F I C A T E

I, Brenda K. Hancock, RMR, CRR and Official Court Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of *U.S. v Tutunjian, et al.*, No. 1:16-cr-10225-DPW.

Date: 6/26/19

*/s/ Brenda K. Hancock*
Brenda K. Hancock, RMR, CRR
Official Court Reporter